(57 Misc. Rep. 345.)
PEOPLE v. HAMILTON BANK OF NEW YORK CITY.

(Supreme Court, Special Term, Ulster County. December 26, 1907.)

BANKS AND·BANKING—INSOLVENCY.

On motion for an order discharging a temporary receiver of an embarrassed bank, and directing that the property in the receiver's hands be turned over to the bank, and permitting it to resume business, it was shown that about 90 per cent. of the depositors had signed an agreement looking toward a resumption of the bank. The report of the banking department showed that on the close of business of the bank it had sufficient assets, after making various deductions, to pay its depositors in full, provide for its capital stock of $200,000, and have a surplus of over $250,000. Affidavits of officers of the bank and depositors tended to show that the inventory and appraisal of the banking department was well made, that the property owned by the bank was worth the amount there set down, and that collateral held as security for the various loans was of ample margin to provide for their prompt payment on becoming due. The superintendent of banks did not oppose application, and the Attorney General was satisfied to have the bank reopened if in a proper condition to be opened. *Held*, that the bank was entitled to the relief asked.

Proceedings by the people against the Hamilton Bank of New York City. Motion by defendant for the discharge of a temporary receiver, and for leave to resume business. Motion granted.

William S. Jackson, Atty. Gen. (W. F. Mackey, of counsel), for the People.

Gifford, Hobbs & Beard (Alton B. Parker, of counsel), for defendant.

Francis A. Winslow, for certain depositors.

BETTS, J. On the 23d and 24th days of October, 1907, and for several days prior thereto, there was great financial unrest in New York and other cities, and many banking institutions and trust companies were forced to close their doors after a run of more or less length and severity, many of them for the reason that the officers thereof were unable to obtain sufficient currency to meet the demands of depositors. Among the institutions thus closing on the morning of the 24th of October was the Hamilton Bank, the above defendant, which had for a few days sustained a run and had paid out about $1,500,000 in cash. It closed its doors, notified the superintendent of banks of this state, and on that morning he took possession thereof, and held the same for about three weeks, informing the Attorney General of such action. During this time various efforts were made by the bank officials, acting in conjunction and sympathy with the depositors, to have the bank open and resume business. These efforts were unsuccessful, and some time in the week closing November 16th those representing the officials of the bank and the depositors were told that by a day named in said week a plan must be submitted for the resumption of business of this bank, which was approved by the superintendent of banks, or the Attorney General would be notified to commence an action, and apply for the appointment of a temporary receiver for this institution as authorized by law. Not submitting a plan which was approved by the superintendent of banks at the time fixed, on the 16th of November, at Kingston, application was made for the appointment of a temporary receiver, and Frank White, a counselor at law, was appointed temporary receiver of said institution, and the order appointing him provided that on the 30th day of November, at Albany, the defendant must show cause at a Special Term of this court why the order appointing a temporary receiver should not be made permanent. Upon that day the defendant and the depositors appeared at Albany, and asked to be given a day speedily at which they could present a proposed plan of resumption. The matter was accordingly adjourned on the application of the defendant and the depositors, and by consent of the Attorney General to Kingston on December 13, 1907, where the argument was had. The defendant and the depositors come into court, and allege solvency of defendant and its ability to now take possession of its own property, and to continue its business, and make its payments according to the plan of resumption provided for, and ask that the temporary receiver be discharged on this motion and the bank and its property turned over to defendant, and that is the proposition that is now before this court. The defendant proposed to pay its depositors, and the plan proposed is simple and short, and is herein inserted:

"Final Agreement.

"New York, November 14, 1907.

"Hamilton Bank of New York City:

"Referring to plan heretofore issued by a Committee acting in behalf of the Hamilton Bank of New York City, dated October 29th, 1907, I beg to advise you that in consideration of the resumption of business on the part of said Bank and in consideration of the execution of similar agreements on the part of depositors representing not less than 75% of the amount of deposits in the said Hamilton Bank, I agree to accept payment of my deposits on the following terms; 10% in cash on opening of said bank; 15% in a certificate of deposit or special deposit to my credit payable 90 days from November 20th, 1907; 15% in a certificate of deposit or special deposit to my credit payable in 6 months from November 20th, 1907; 60% payable in a certificate of deposit or special deposit to my credit in one year from November 20th, 1907. Accounts drawing interest prior to suspension will continue to draw interest. Whenever in the judgment of the officers the condition of the Bank will warrant, the bank will either accept as security for loans deposits or certificates covering the same, or will anticipate the payment of such deposits or certificates. Rights to offset, if any exist, either in favor of the bank or depositors, will continue."

·The bank had at the time of the hearing on the motion procured practically 85 per cent. in amount of its depositors to agree to this proposed plan; that is, the consent signed by these several depositors permitting a resumption of the bank according to the plan proposed. Since the hearing the court is informed that about 5 per cent. more have signed, so that there is now practically about 90 per cent. of the depositors that have signed this agreement looking towards a resumption of the bank. The report of the examiners of the banking department shows that on the close of business of this bank on October 24, 1907, it had sufficient assets after making various deductions to fully pay all its depositors in full and other creditors, and provide for its capital stock of $200,000, and to have a surplus of $263,215.96. Various affidavits were submitted by the defendant and depositors on this hearing, by which they claimed to show that the inventory and appraisal of the banking department was well made, that the property owned by the bank was worth the amount there set down, and that collateral held as security for the various loans was of ample margin to provide for their prompt payment on becoming due, and the affidavits presented went far towards substantiating such claims. On this state of facts the court is asked on this motion to vacate the order appointing a temporary receiver, and to direct that this property in the hands of the temporary receiver be turned over to the defendant, and that it be permitted to resume business at its banking institutions, consisting of a main bank and six branches as a solvent, going institution. The Attorney General, while not directly questioning the solvency of the bank, yet insists that the opinion of the banking department as to the feasibility of this proposed plan for reopening should be taken before making the order asked for. It is also insisted on behalf of the Attorney General that the court has no power on this motion to grant the order asked, but could only do so at the end of a trial. It was stated on the motion by the attorneys for the defendant and the depositors that the superintendent of banks claims that the matter had now passed from his jurisdiction, and was in the custody of the court to take such action as to it might seem proper.

There were about 18,000 of these depositors and 90 per cent. in amount as heretofore stated have now signed the above agreement. The defendant and the depositors quote as authority for the proposed action taken here the case of Ferry v. Bank of Central New York, 15 How. Prac. 445. That was a case which arose in 1857. That institution was compelled to stop payment then on account of the financial stringency and panic which then prevailed in a degree somewhat similar to that which occurred in October of this year. On application of a stockholder, and on consent of the bank, a receiver was appointed in October, who took possession of the property and proceeded to make collections and administer the trust thus given to him, and an injunction was issued restraining defendant from continuing its banking business. In January, 1858, a motion was made at a Special Term of the Supreme Court by the defendant on statements, alleging its complete solvency and asking that its property might be restored to it, receiver discharged, injunctions vacated, and it permitted to resume the business of banking. Various objections were urged then to the merits and to the procedure as they are urged now, and in many respects much the same condition of affairs existed at that time as exists at the present time. Some stockholders opposed resumption. The court restored the property to the defendant to continue as a going, banking institution, and the learned judge writing the opinion held as follows, as to the solvency of the institution and the power of the court to restore the property on motion:

"The only remaining ground urged by the counsel for the defendant was as to the solvency of the institution at the time the proceedings were instituted and at present. The language of the act under which the action was commenced, is: 'Whenever any corporation having banking powers, or having the power to make loans on pledges or deposits, or authorized by law to make insurances, shall become insolvent or unable to pay its debts, etc., the court of chancery may by injunction restrain,' etc. 2 Rev. St. (1st Ed.) pt. 3, c. 8, tit. 4, § 39. There is not so much difficulty in defining insolvency when applied to moneyed corporations as in determining what in a particular case, or class of cases, shall be the evidence of insolvency. Insolvency in the abstract has the same signification, whether applied to corporations or associations, and means a general inability to pay one's debts, an inability to fulfill one's obligations, according to his undertaking, a general inability to answer, in the course of business, the liabilities existing and capable of being enforced. Not an absolute inability to pay one's debts at some future time upon a settlement and winding up of all a trader's concerns, but as not being in a condition to pay one's debts in the ordinary course, as persons carrying on trade usually do. Brouwer v. Harbeck, 9 N. Y. 589, and cases cited; 2 Bell's Com. 162; Thompson v. Thompson, 4 Cush. (Mass.) 134; Mitchell v. Gazzam, 12 Ohio, 335; Herrick v. Borst, 4 Hill, 654. The question as to actual or contemplated insolvency has most frequently arisen under bankrupt and insolvent laws, and, in testing the validity of transactions sought to be avoided under acts of the like character, and has been rather as to the evidence of insolvency, either actual or contemplated in each particular case, and under a particular statute, than as to what constituted insolvency generally. * * * An inability to pay arising from unexpected and unforeseen contingencies would not alone be evidence of insolvency within the statute under consideration, or any concerning bankruptcies and insolvencies. A merchant or trader who should be driven to protest, by the failure to receive an expected remittance, or the bankruptcy of a debtor, upon whom he had relied, would not for that reason be deemed insolvent, and yet he would have failed to fulfill his obligations according to his undertaking. If from taking a reasonable view of his situation and the surrounding circumstances at the

time it could fairly be seen that he was able not only ultimately to pay his debts, but could at once recover from the temporary embarrassment and derangement of his business by a proper application of his means, and could carry on his business and meet his engagements in the ordinary course, and as persons in the same business usually do, he would properly be called solvent. So, too, if the present inability to pay was the result of a crisis. a peculiar stringency in the monetary affairs of the country, instead of the failure of one individual, and one source of supply, and by which he was cut off temporarily from the resources upon which he was accustomed to rely, and upon which traders in like circumstances are accustomed to rely, the effect would be the same on the general question of insolvency. It is no evidence of insolvency that a trader habitually relies upon anticipating the payment of his bills receivable by procuring them to be discounted to meet his engagements, or procuring loans upon his own credit, relying upon collections to repay the loans. This usual reliance may fail him, and he be left unable to meet his engagements, and yet be far from insolvent within any definition of the term. The same principle applies to banking corporations and associations. The liabilities of these institutions payable presently always exceed very largely the present absolute ability to pay. Every dollar of their circulation and their entire deposits are subject to call, and may be demanded in a single day, and yet it is well known that no bank keeps on hand either in coin or bills of solvent banks an amount equal to one-tenth of the obligations which they are legally bound to answer on demand. * * * The institutions themselves rely upon their ability to meet their engagements not at one time and upon demand, but according to the course of business. This dependence, aside from their ultimate and final ability to pay to the extent of their obligations, is upon the general and known course of business, by which they are enabled to calculate upon the average amount of deposits, and the length of time which they are permitted to remain, and the rate at which their circulation will be returned for redemption; (2) upon their ability in any emergency that may arise to realize upon their assets by negotiating their bills receivable, or in some other legitimate and customary way, making their resources available for present purposes. Both these resources may fail in times of general distrust and monetary pressure, and leave a banking institution with abundant resources, unable upon an unexpected emergency and unusual call to meet its engagements. If the inability of a bank to meet its undertakings arises solely from an unexpected crisis, like that through which we have just passed, or are now passing, and exhibits resources abundantly sufficient to enable it to meet its engagements and discharge its liabilities in the ordinary and usual method of conducting that business, it should not be pronounced insolvent with a view to its dissolution. The question is whether with its own resources it can pay its debts, and be in a situation to conduct its business in the ordinary course and as banks usually do. If a bank is so circumstanced as to depend upon the individual resources and exertions of its directors and stockholders, and compelled to rely upon their private funds to meet its engagements, and only claims to be able to pay at a future day, it could not be said to be solvent."

The opinion of the superintendent of banks was not asked in that case so far as appears. There was one. In 1829 (see chapter 94, p. 167) an act was passed which provided for the appointment of three banking commissioners who were given certain general powers of visitation and supervision over banks. An additional banking commissioner was provided for by chapter 363, p. 306, of the Laws of 1840. These commissioners were abolished by section 6, c. 218, p. 301, Laws 1843, and their duties transferred to the Comptroller of the state. By chapter 164, p. 309, Laws 1851, "An act to organize a bank department," the office of bank superintendent was created, and this state has had a superintendent of banks ever since; so that in 1858 a bank superintendent was not a novelty. While the powers of banking commissioners and superintendent of banks were added to from time

to time, he, of course, had in 1858 no such full and complete super-
visory power as he has now.

It is important, in view of the proposition submitted, to see just .
what the defendant will have to provide for, and what it has to do
it with, if it is permitted to open its bank. As shown by the schedules
from the banking department submitted on the hearing, on October
24th, there were deposits amounting to $5,442,209:95. The bank had
other liabilities, exclusive of its stock, amounting to $219,495.78; total
liabilities of $5,661,705.73, exclusive of stock. It had assets of $6,124,-
921.69. In order to open its bank, it must provide for the payment of
all its other liabilities, aside from depositors, of $219,495.78. It also
must provide for the payment of 10 per cent. in amount of its depos-
itors not yet agreeing to the proposed plan, which amounts to $544,-
220.99, and also to pay this first 10 per cent. to the agreeing depositors,.
amounting to $489,798.89, showing a necessity for cash in hand of
$1,253,515.66. The temporary receiver reported that he had at the
time of the hearing on hand in cash $506,000. The directors also pro-
duced contracts, signed by banks able so to do, agreeing to loan to
defendant upon its collateral cash to the amount of $1,000,000, which
would show upon its opening the bank would have in cash $1,506,000.
We have thus shown that in order to meet cash payments, provided all
payments were demanded upon opening, that is by parties who would
be in position to demand such payments, a condition which is not at
all likely, the bank would have on hand $1,506,000, to pay as fast
as demands could be made $1,253,515.66, leaving a balance of $252,-
484.38 in cash after making all the payments that could be demanded,.
and without the bank making any collections or receiving any deposits.

It was shown by affidavits, and not denied, that various people had
endeavored to make payments of amounts of money secured by notes.
upon being allowed as set-off thereto the amount of their deposits. At
the time of the hearing the court had not sanctioned such payments,.
so the temporary receiver was not in position to receive the same. It
was also shown that there were other parties ready and willing to
pay loans as soon as the bank opened for business to quite an amount,.
and that some had offered to pay, but had not succeeded in finding,
at the time that they made the offer, a person in charge to receive the
same. It was also shown by the vice president that there were call
loans aggregating $700,000, the most of which could be collected soon
after the bank opened. That the court has gone beyond the probable
limit of cash that this bank would need in order to open is shown by
the fact that of the above $219,495.78 of other liabilities, much of it is .
owing to banks who may or may not make immediate demand for pay-
ment of their claims, and there are also in cases of some of these
banks offsets which the defendant would get the benefit of.

There was submitted on the hearing on behalf of the Attorney Gen-
eral suggestions made from the superintendent of banks under date
of November 11, 1907, as to this particular bank in which the super-
intendent stated in regard to resumption as follows:

"As to resumption of business, I understand that effort is being made to
secure agreements from the depositors to limit the immediate drawing to
ten per cent. (10%) and to issue certificates of deposit payable, 15% in 90

days, 15% in 6 months and 60% in one year. I am informed that 50% of deposits have so signed. At the present time the bank has about $260,000 cash on hand. It would seem to me unwise for this Bank to resume without cash considerably in excess of the ten per cent. (10%). Certainly with not less than $1,000,000 and this predicated on the signing of all depositors in accordance with the above plan."

So from these suggestions of the superintendent it will be seen that the superintendent thought it desirable that the defendant before attempting resumption should have at least $1,000,000 in cash on hand, and the bank has in fact provided for over $1,500,000 in cash. Certain other suggestions were made by the superintendent which the court assumes that the bank will conform to if it opens. The court is informed that, if reopening be permitted, the board of directors will be greatly strengthened. The superintendent of banks has not opposed this application. The defendant claims that, as soon as its doors are opened if directed to be opened by this court, then it becomes at once subject to the jurisdiction of the superintendent of banks, and will, of course, acquiesce in and conform to all his suggestions. The suggestion is made that by the system of payments for depositors provided for in the agreement submitted that the defendant is not providing for payment on demand in the usual course. This, if correct, is not of interest it would seem to any persons except the depositors. All other creditors are provided for, and, of course, the depositors are provided for in the manner which they assent to, so that it is not really a delayed payment, but a present meeting of demands of depositors in a form acceptable to both parties.

The further point is made that the bank would not have the full legal reserve. That is not entirely correct. It would have much more than the legal 15 per cent. reserve on opening. It would not, however, have the full reserve if after opening all sums that may be withdrawn were withdrawn and nothing in the meantime is collected or deposited. We have before referred to the $700,000 call loans. If collected promptly, that sum or a comparatively small portion of it would much more than sustain the legal reserve, and the bank will at least open with much more than the legal reserve. The question now is whether the court should authorize the opening of this bank. There are, aside from the stockholders, practically 18,000 people directly interested as depositors, mostly residents of the immediate vicinity of this bank or some of its branches. The bank shows ability to pay every one entitled thereto on demand; and still have remaining over a quarter of a million of dollars. Every one of these depositors is interested in having this institution open as a going institution and stay open. It seems altogether unlikely that anything like the amount of money that could be withdrawn would be at the opening of the bank or at any other time when these several deposits are released. This is not a proposition looking to a scaling down of deposits as was the case of Ulster County Savings Institution, 64 Hun, 434, 18 N. Y. Supp. 960, nor of an insolvent bank. It is a proposition of parties to an action owning property asking to have it restored to them to the end that justice may be done to all parties, payments made as agreed and the bank continued as a solvent going institution. It means much to the depositors and stockholders and to many residents in the vicinity not

directly interested or represented here. It appeals strongly to a court of equity and to the conscience of the court. It has not been shown that any person would or could be harmed by the relief asked for and great good would certainly be done. The court thinks that from the sentiment in that vicinity that it would not be possible for the bank to fail to succeed if permitted to open, nor does the court think it ought to hesitate or delay because a full trial has not been had in this action. The statute is not susceptible of the construction that a temporary receivership must always be followed by a permanent one. The defendant comes in and shows as cause why a permanent receiver should not be appointed that it is not necessary to have any receiver at all, and asks for its property to be returned, being now in a condition to properly handle and care for it, and the proposed procedure has precedent and strong common sense to support it. The superintendent of banks, as before stated, is not opposing this application. The Attorney General is satisfied that the bank shall be opened if it is in a proper condition to be opened. The court thinks it is. It comes squarely within the ruling and practically within the procedure laid down in Ferry v. Bank of Central New York, supra. The court is going to restore the bank's property and permit its reopening.

An order may be entered: (1) Vacating the injunction heretofore granted and permitting the defendant to continue the business of banking. (2) Directing the temporary receiver to turn over to defendant all its property in his possession, except an amount of cash which shall be reasonably sufficient to pay him his fees and disbursements and his counsel fees. (3) Appointing Hon. Clarence E. Bloodgood, of Catskill, N. Y., a referee for the purpose of passing the temporary receiver's accounts and fixing the proper fees and disbursements of said temporary receiver and his counsel, with power to sit in New York county, if desired, and to report to this court with all convenient speed. (4) Providing that upon said temporary receiver's fees and disbursements and that of his counsel and the costs of the reference, being fully paid and all the remaining property, if any, being turned over to the defendant, that said temporary receiver be discharged and his bond canceled. If form of order not agreed upon, the same may be settled before me at my chambers at Kingston, on Thursday, January 2, 1908, at 10 a. m. If matter of compensation of temporary receiver and his attorney can be determined before me on that day by agreement or otherwise, order of reference need not be entered.